IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

WELLS FARGO BANK, N.A.,

    Plaintiff,

vs.

LEROY WILLOUGHBY, et al.,

    Defendants.

Case 1:15-cv-129-AA

ORDER

AIKEN, Chief Judge:

    Plaintiff Wells Fargo Bank brings this action against Defendant LeRoy Willoughby to recover money lost because of a check-cashing scam. Defendant accepted an offer to work part-time as a "payment officer" for a business in Japan, but the job offer was actually a check-cashing scam, "in which the victim is asked to accept what appears to be a legitimate check on behalf of a foreign corporation, deposit the funds, then wire some or all of the proceeds to a

1 - ORDER

foreign account before the victim's bank realizes that the check is, in fact, counterfeit." Branch Banking & Trust Co. v. Witmeyer, 2011 WL 3297682, at *1 (E.D. Va. 2011) (footnote omitted). The scam here followed the pattern: Defendant deposited a $150,000 check to open an account with Plaintiff. When Plaintiff made the funds available, Defendant wired more than $95,000 to a bank in Japan. A few days later the $150,000 check was dishonored as counterfeit, and the wired funds could not be recovered. Those responsible for the scam have not been identified.

Plaintiff now moves for summary judgment on its claims for breach of contract, breach of warranty, conversion, account stated, and statutory violations. Defendant responds that he was a victim of the scam and had no intent to defraud Plaintiff.

The most culpable party is not before the court, so the issue is whether Plaintiff or Defendant should bear responsibility for the loss. Because Defendant was the party best able to prevent the loss, the Uniform Commercial Code, which governs the transaction here, holds Defendant responsible. See Ed Stinn Chevrolet, Inc. v. Nat'l City Bank, 28 Ohio St.3d 221, 226, 503 N.E.2d 524, 530 (Ohio 1986) (per curiam), modified on other grounds, 31 Ohio St. 3d 150, 509 N.E.2d 945 (1987). I grant Plaintiff's motion

for summary judgment.

## I. Defendant Has Not Submitted Sworn Statements

Because Defendant is representing himself, I issued a notice explaining summary judgment procedures. ECF No. 21. The notice instructed Defendant to "set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(e), that contradict the facts stated in Plaintiff's declaration and documents and show a genuine issue of material fact for trial." ECF No. 21 at 2 (original emphasis). The notice explained that Defendant could "submit a declaration stating, under penalty of perjury, any relevant facts that you have personal knowledge of, that is, something you personally saw, heard, did, or wrote (or did not do, see, or hear, if you are denying that an incident occurred)." ECF No. 21 at 2 (emphasis added).

Defendant states that his factual allegations are "true and correct to the best of my knowledge." Def.'s Mem. at 1, ECF No. 26. But Defendant does not make his factual allegations under penalty of perjury, as required by this court's order. Cf. Le Boeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999) (when ruling on a summary judgment motion, the court may consider a letter made "under penalty of perjury" even though the

letter did not state that its contents were "true and correct").

I agree with Plaintiff that Defendant's allegations are not properly sworn. I will consider them here only to resolve Plaintiff's motion for summary judgment. I will also consider, for this motion only, Defendant's copies of his email correspondence with the person or persons behind the check-cashing scam.

**II. Factual Background**

In 2008, Defendant, then living in Colorado, searched the internet for part-time work he could perform at home. After receiving job offers by email, Defendant states he "found out from the FBI that the part time work at home jobs were scams and most of the scams were originating from Nigeria as well as South Africa." Def.'s Mem. 2, ECF No. 26. Defendant "became very suspicious of any emails for part time jobs." Id.

On January 7, 2009, Defendant received an email ostensibly from Itochu Corp., a large multinational business based in Japan, offering part-time work depositing checks and wiring funds in exchange for a 5% commission. Defendant states that he worked more than twenty-five years in Japan and "was very familiar with the companies and practices over there." Id. Furthermore, Defendant was "familiar with

[Itochu Corp.] because he had taught English to some of their managers and executives." Id. Even though the job offer resembled a typical check-cashing scam, Defendant states that he was "more trusting of emails from this company and their needing a part time employee to help them with their overseas business." Id.

The initial email[1] to Defendant explained that because most of Itochu Corp.'s board members did not understand English, the company sought a "noble and trusted representative client from CANADA AND USA." Id. at 5 (copy of email). The email stated, "Most of our customers pay out in check and we do not have an account in your country that will clear this money. Again, this is the problem of language." Id.

The email described the work required: "Your tasks are Receive payment from Customers Cash Payments at your Bank. Deduct 5% which will be your percentage/pay on Payment processed. Forward balance after deduction of percentage/pay to any of the offices you will be contacted to send payment to." Id.

Defendant responded with an email expressing his

---

[1] As Plaintiff notes, applicants were told to send information to a Yahoo.com webmail address based in Hong Kong, not a corporate email address based in Japan. See Pl.'s Reply 6 & n.2, ECF No. 28.

interest in the work. Defendant stated that he "used to teach English to your staff in Japan and am familiar with Itochu Corp." Def.'s Mem. 4, ECF No. 26.

On January 8, 2009, the false Itochu Corp. sent Defendant an email accepting him as a "payment officer." The email instructed Defendant to deposit checks and to notify the company when his bank made the funds available. Defendant would then be told where to transfer the funds.

On January 13, 2009, Defendant responded by email, stating "the percentage for my participation has usually been 10-15%. Therefore, unless there is the 10-15%, I am not interested in continuing further with our venture." Def.'s Mem. 7 (copy of email).

As shown by the email correspondence submitted by Defendant, the scam's success depended on Defendant believing that (1) a multinational corporation based in Japan would forfeit 5% of payments received from North American customers because its board members did not understand English; (2) the multinational corporation had no access to banks in North America, so it used blind email solicitations to hire payment officers whose only qualifications were access to a bank account and the ability to understand English; and (4) the corporation had no mechanism, other than "trust," to prevent a payment officer

from keeping the entire amount of the payment rather than only the 5% commission.

On January 27, 2009, Defendant received the $150,000 check that gave rise to this action. See Compl., Ex. A, at 1, ECF No. 1 at 9 (copy of check). On its face, the check appeared legitimate, payable to Defendant, issued by a business called MDS in Ontario, Canada, and drawn on an account at the Canadian Imperial Bank of Commerce (CIBC).

After Defendant received the check, he was apparently instructed by email that he was working for CNOOC Oil Base Group Ltd. China, rather than Itochu Corp. Responding to this new development, Defendant stated that he did "not want to process [the check] until I know what this is all about. I didn't know I was working as a rep for CNOOC Oil." Def.'s Memo. 9 (copy of email). Despite this discrepancy, and the other red flags, on January 28, 2009, Defendant endorsed and deposited the check in a newly opened account at a Wachovia Bank (Plaintiff's predecessor in interest) in Pueblo, Colorado.

Defendant states that when he opened the account, he told bank employees that he "was suspicious of the check and with [Plaintiff's] advice proceeded with the deposit." Def.'s Am. Memo. ¶ 9, ECF No. 27. Defendant alleges that Plaintiff's employees told him "if the check clears, the

7 - ORDER

funds were okay." Def.'s Memo. ¶ 7, ECF No. 26. Defendant does not allege that he told anyone why he thought the check was suspicious.

On January 28, 2009, Defendant notified "boydbarrett@consultant.com," apparently another contact with his employer, that Plaintiff would make funds from the $150,000 check available to Defendant on February 5, 2009. Defendant stated, "I am still waiting for an answer to prior email for more details of my involvement." Def.'s Mem. 10.

On February 5, 2009, Plaintiff credited $150,000 to Defendant's account. Defendant withdrew $5,500, depositing $5,000 in a new account and taking $500 in cash.

That day, Defendant emailed "Boyd Barrett" again, stating that the check had cleared. He wrote, "I await further direction from you or CNOOC Oil Base Group Ltd China. I await the next transfer as well." Def.'s Mem. 11.

Defendant then received an email supposedly from Eizo Kobayishi, the president of Itochu Corp., instructing Defendant to wire $96,905 to Resona Bank, in Hiroshima, Japan, to the account of Asako Tradings. Defendant wired the funds as instructed, and notified "Kobayishi-san."

As of February 6, 2009, Plaintiff had not received payment for the $150,000 check from CIBC, the "payor" bank. On February 9, 2009, CIBC returned the check as dishonored.

Plaintiff promptly notified Defendant that the check had been dishonored. The next day, one of Plaintiff's employees told Defendant that his accounts were on hold and that Plaintiff suspected fraud.

Defendant states that Plaintiff's employees told him "not to worry about anything, since it had been turned over to their fraud department." Def.'s Mem. ¶ 14. On February 10, 2009, Plaintiff's investigator spoke to Defendant about the fraudulent check. Defendant told the investigator he had been suspicious about the check.

On February 26, 2009, the Japanese bank that had received the wired funds notified Plaintiff that the transfer could not be reversed and the funds would not be returned. Asako Tradings was a fictional entity. The money was never recovered.

In April 2009, Plaintiff sent Defendant an account statement showing a negative balance of $97,448.99. That is the amount Plaintiff now seeks as damages.

## STANDARDS

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. If the moving party shows that there are no genuine issues of material fact, then the nonmoving party must go

beyond the pleadings and designate facts showing an issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

**DISCUSSION**

**I. Claims Under the Uniform Commercial Code**

Because this action arose in Colorado, Plaintiff brings its claims under the Colorado law. Like other states, Colorado has adopted the Uniform Commercial Code (UCC),[2] whose provisions govern here. See Bank of Am. Nat'l Trust & Sav. Ass'n v. United States, 552 F.2d 302, 303 n.1 (9th Cir. 1977).

**A. Indorser Liability**

"[I]f an instrument is dishonored, an indorser is obliged to pay the amount due on the instrument (I) according to the terms of the instrument at the time it was indorsed." Colo. Stat. § 4-3-415(a) ("Obligation of indorser"). Here, Defendant endorsed and deposited the counterfeit check, and the check was later dishonored. Although the wired funds were lost, Plaintiff was able to prevent further losses after learning the check was dishonored. Defendant is not liable for the entire amount

---

[2]Because the UCC provisions at issue have been adopted nationwide in substantially identical form, decisions from other jurisdictions are instructive here. See Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex, Inc.), 349 F.3d 711, 718 n.8 (3d Cir. 2003).

10 - ORDER

of check but for $97,448.99, the amount lost.

Defendant argues that he never intended to defraud Plaintiff. But intent to defraud is not relevant to Plaintiff's claims under the UCC. See Vadde v. Bank of America, 687 S.E. 2d 880, 886 (Ga. App. 2009) (rejecting argument that "ignorance of a fraud or counterfeit is a defense to a collecting bank's claim for recoupment"); SunTrust Bank v. Bennett (In re Bennett), 517 B.R. 95, 104 (Bankr. M.D. Tenn. 2014) (bankruptcy court noted that debtor would have been liable for endorsing and presenting bad checks "regardless of any fraudulent intent").

Defendant argues he is also a victim of the scam. But when the true culprit behind a scam is not before the court, the Uniform Commercial Code assigns responsibility to the party who was best able to prevent the loss:

> In resolving the unfortunate dilemma presented by this case, we remain cognizant that the Uniform Commercial Code is a delicately balanced statutory scheme designed, in principle, to ultimately shift the loss occasioned by negotiation of a forged instrument to the party bearing the responsibility for the loss. Ideally, the thief is held accountable. The unfortunate reality is that the loss is often shifted to the innocent party whose conduct or relationship with the forger most facilitated the risk of loss.

Ed Stinn Chevrolet v. Nat'l City Bank, 28 Ohio St.3d 221, 226, 503 N.E.2d 524, 530 (Ohio 1986) (per curiam), modified on other grounds, 31 Ohio St. 3d 150, 509 N.E.2d 945 (1987).

"The provisions of article 3 of the Uniform Commercial Code ensure the ready negotiability of commercial paper. In addition, the provisions relating to check fraud further a policy of assigning loss based upon the relative responsibility of the parties 'by establishing commercially sound rules designed to place the risk of loss attributable to fraud such as forged indorsements with the party best able to prevent them.'" Guardian Life Ins. Co. of Am. v. Chem. Bank, 94 N.Y.2d 418, 421, 727 N.E.2d 111, 114 (N.Y. 2000) (quoting Getty Petroleum Corp. v. Am. Express Travel Related Servs. Co., 90 N.Y.2d 322, 326, 683 N.E.2d 311, 324 (N.Y. 1997)).

Here, I agree with Plaintiff that between Plaintiff and Defendant, Defendant is responsible for the loss. Defendant chose to endorse and deposit the counterfeit check despite the red flags indicating it was part of a check-cashing scam. He then chose to wire the funds to an unknown party despite discrepancies in the instructions to him.

Defendant alleges that Plaintiff's employees assured him that if Plaintiff credited his account, that would show that the check was valid. Defendant does not identify the employees who made these alleged statements, and there is no evidence other than Defendant's own unsworn allegation of any such statements. Even accepting Defendant's allegations

as true, oral statements by Plaintiff's employees cannot modify Defendant's obligations under his agreement with Plaintiff. See Sheffield Decl., Ex. 1 at 14-15 (agreement provides that it may not be "changed orally").

Plaintiff was required by the Expedited Funds Availability Act (EFAA) to give its customers prompt access to deposited funds. See Essex Constr. Corp. v. Indus. Bank of Wash., Inc., 913 F. Supp. 416, 418 (D. Md. 1995) (construing EFAA, 12 U.S.C. § 4006). When Plaintiff made funds available to Defendant, Plaintiff was not vouching for the check's validity. See id., 913 F. Supp. at 419 ("The EFAA requires that banks provide prompt access to valid deposits, not that banks assume liability for bad checks given to depositors."). Under the EFAA and the UCC, banks may make a "provisional settlement" on a deposit, crediting the customer's account with the amount of a deposited check even though the bank (called the "depositary bank") has not yet received payment from the "payor bank" on which the check was drawn. See id., 913 F. Supp. at 418; UCC § 4-214(a). If, as here, the payor bank dishonors the check, the depositary bank (also called the "collecting bank" when it seeks payment) "retains the right to revoke or charge back funds that are provisionally credited to a customer until the collecting bank's settlement with the payor bank

13 - ORDER

becomes final." 913 F. Supp. at 418.

**B. Breach of Warranty**

Defendant is also liable for breach of warranty. See UCC § 3-417. By presenting the check to Plaintiff for payment, Defendant represented that he was entitled to receive payment. Because the check was counterfeit, Defendant is liable for breach of warranty up to the amount actually lost plus expenses and interest. See Colo. Stat. § 4-3-417(d)(2) ("The person making payment may recover from any warrantor for breach of warranty an amount equal to the amount paid plus expenses and loss of interest resulting from the breach.").

**II. Breach of Contract**

When Defendant opened the account with Plaintiff, he agreed to repay Plaintiff promptly for overdrafts caused by the return or dishonor of any check he deposited in the account. Sheffield Decl., Ex. 1, at 9 (copy of agreement), ECF No. 20. The agreement allowed Plaintiff to debit Defendant's account for the amount of a returned check, and to "overdraw" Defendant's account if he had "insufficient funds in [the] account to cover a returned item." Id. The agreement also required that Defendant reimburse Plaintiff for its costs and expenses incurred while pursuing the claim.

14 - ORDER

The undisputed facts are that Defendant submitted a check that was later returned, and that he did not have enough funds to cover the resulting overdraft. There is no evidence that the agreement is invalid, or that Defendant was not competent to enter into it. I conclude as a matter of law that Defendant is liable for breach of contract.

I need not address Plaintiff's other claims.

## CONCLUSION

Plaintiff's motion for summary judgment (#18) is granted. Plaintiff is to prepare a proposed judgment within fourteen days of this order.

IT IS SO ORDERED.

DATED this 22nd day of September 2015.

_____
Ann Aiken
United States District Judge

15 - ORDER